UNITED STATES v. GONDRAND SHIPPING CO., INC.

**No. 5970.**—Invoices dated Budapest, Hungary, October 3, 1938, and March 2, 1939.
    Entered at New York, N. Y., October 24, 1938, and March 20, 1939. Entry Nos. 9695 and 24554.

Third Division, Appellate Term

(Decided December 27, 1943)

*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster*, special attorney), for the appellant.
*Lamb & Lerch* (*John G. Lerch* and *Thomas J. McKenna* of counsel) for the appellee.

Before CLINE, KEEFE, and EKWALL, Judges

CLINE, Judge: This is an application for review of the decision of the trial court in *Gondrand Shipping Co., Inc.* v. *United States*, Reap. Dec. 5837. The entries were filed by Gondrand Shipping Co., Inc., but the invoices show that the merchandise was purchased

by George Horvath, who is the party in interest. Two cases were consolidated for trial.

The merchandise involved consists of cotton voile blouses embroidered in fancy designs, exported from Hungary on October 3, 1938, and March 2, 1939. The articles were invoiced and entered at 20, 26, and 30 cents each, United States currency, on the basis of export value, and were appraised on the basis of export value at 36, 46.8, and 54 cents each, respectively, packing included.

Six witnesses appeared in behalf of the importer and the Government introduced one witness and two reports of customs agents which were marked "Exhibits 3 and 4."

The appellant contends that the importer failed to prove. by evidence of probative value that the imported merchandise is properly dutiable at the entered values and that, in any event, no testimony was introduced regarding three items covered by reappraisement 140580–A, invoiced as "childrens frocks," and that the presumption of correctness attached to the appraiser's valuation of those items has not been overcome.

When the cases were called for trial, the parties agreed that certain samples were representative of the merchandise involved. Samples representing the articles invoiced at 20 cents each were marked "Exhibits A–1 and A–2"; those representing the articles invoiced at 26 cents each were marked "Exhibits B–1, B–2, and B–3"; and those representing the articles invoiced at 30 cents each were marked "Exhibits C–1, C–2, and C–3." Numerous other samples were introduced as illustrative exhibits, representing blouses at higher values produced by manufacturers other than the one making the imported merchandise. There were also some samples of higher values connected with exhibit 4.

The bulk of the evidence, consisting of the testimony of four expert witnesses, relates to the difference in quality between the blouses covered by exhibits A, B, and C, with the appropriate sub-numbers, and those in the illustrative exhibits and those forwarded as a part of exhibit 4. It appears from this testimony that the quality of the cotton voile in all of the exhibits is about the same, but the thread in the embroidery in the illustrative exhibits is of better quality than that in the samples representing the imported merchandise and that the quality of the embroidery and the designs in the illustrative exhibits and those forwarded with exhibit 4 are far superior to the imported merchandise. The importer's expert witnesses pointed out the character of the embroidery on the articles which would be determinative of the value and testified that the illustrative exhibits and those which were a part of exhibit 4 were from 50 to 400 per centum higher in value than the imported goods.

One of the witnesses introduced in behalf of the importer was the general director of the company which manufactured the articles in the instant case and who was in Hungary when the goods were shipped. He was shown the invoices in the reappraisement appeals before the court and testified that exhibits A, B, and C, with their accompanying sub-numbers, represent the goods covered by the invoices; that in 1938 and 1939 he sold such goods in Budapest, Hungary, in wholesale quantities both for home consumption and also for export; that the goods were freely offered and sold for home consumption in Hungary at prices in pengos, the currency of Hungary, but the equivalent prices would be approximately the same as the values on the invoices in United States currency; that the usual quantities of the sales in Hungary to persons who resold the merchandise were in lots of 2 or 3 dozen pieces but he offered the merchandise at the same prices in any quantity that the purchaser wished; that most of his sales were made in Budapest, which is the central market for such goods, and purchasers came to Budapest to buy the same; that the sales to George A. Horvath & Co., of New York, were only 5 per centum of the business of his firm; that he had quoted to other American purchasers the same prices paid by George A. Horvath & Co. and samples of the merchandise were purchased by other buyers but no sales to other American firms were made in large quantities.

The testimony of the managing director of the manufacturing company is substantially corroborated by the report of the customs agent in exhibit 3. It appears from that report that the Treasury representative visited the manufacturing company and examined the books of the concern. The only point in the managing director's testimony which appears to be in conflict with the statements in exhibit 3 is that the Treasury representative found three sales in the books of the concern to United States concerns other than the importer in this case. There were other goods covered by these sales, but two of them contained cotton voile blouses invoiced as 20, 26, or 30 cents each in quantities of from 6 to 20 pieces. These sales may be the sample orders which the witness mentioned but they appear to be in quantities almost as large as the usual wholesale quantity sold in Hungary.

The report of Treasury representative S. Bruner, exhibit 4, indicates that when he visited Hungary in 1940 he could obtain no information at the manufacturing concern on account of the absence of the books, so he visited other firms making cotton voile embroidered blouses which were priced higher than those produced by the manufacturer of the goods in this case. Samples of goods from some of those firms were forwarded with the report. The report relates principally to the cost of production of blouses manufactured by firms other than the exporter in this case.

We are of opinion that the evidence supports the finding of the trial court that the entered values of the merchandise were the export values thereof and that there were no higher foreign values. We find that the weight of evidence indicates that the values at which the imported articles were freely offered for sale for exportation to the United States in the usual wholesale quantities in the ordinary course of trade in Budapest, the principal market for such goods in Hungary, and also at which they were freely offered and sold for home consumption in that country at the time of exportation, were the entered values.

As to the contention of the appellant that there is no evidence in the record regarding the values of three items invoiced as "childrens frocks" covered by reappraisement 140580–A, the record shows that the invoices in this case were shown a representative of the importing firm and he testified that exhibits A, B, and C, with their appropriate sub-numbers, represent the merchandise on the invoices and the managing director of the manufacturing concern testified likewise. There is nothing in the record to indicate that the articles invoiced as "childrens frocks" were different from the blouses represented by the exhibits.

The decision and judgment below are affirmed.